**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-14519-RGM |
| AIROCARE, INC., ) | |
| ) | (Chapter 11) |
|     Debtor. ) | |
| ) | |
| ) | |
| AIROCARE, INC. ) | |
|     44330 Mercure Circle, Ste. 150 ) | Adversary Pro. No. _____ |
|     Dulles, Virginia  20166, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| WILLIAM R. CHAMBERS, ) | |
|     10229 Cedar Pond Drive ) | |
|     Vienna, Virginia 22182, ) | |
| ) | |
| ROBERT D. McDONALD, ) | |
|     201 N. Union Street, Ste. 100 ) | |
|     Alexandria, Virginia 22314, ) | |
| ) | |
| JACK W. PROUTY, ) | |
|     309 Dawnwood Drive ) | |
|     Edgewater, Maryland 31037, ) | |
| ) | |
| STUART N. RUTCHIK, ) | |
|     723 Galestone Street ) | |
|     Gaithersburg, Maryland 20878, ) | |
| ) | |
| TERRANCE O. WOODBRIDGE, ) | |
|     107 Parkcanyon Lane ) | |
|     Cary, North Carolina 27519, ) | |
| and ) | |

|  |  |
|---|---|
| RONALD B. MAZIE, AS TRUSTEE OF | ) |
| THE AIROCARE BENEFITS TRUST, | ) |
| 17216 Blossom View Drive | ) |
| Olney, Maryland 20832, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**COMPLAINT OF AIROCARE, INC., FOR (I) DECLARATORY JUDGMENT, (II) TURNOVER, (III) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS, (IV) CONSTRUCTIVE TRUST, (V) SUBSTANTIVE CONSOLIDATION, (VI) BREACH OF FIDUCIARY DUTY, (VII) UNJUST ENRICHMENT AND (VIII) BREACH OF CONTRACT**

AirOcare, Inc., the debtor and debtor-in-possession in the captioned chapter 11 bankruptcy case ("AirOcare"), hereby files this Complaint for (i) Declaratory Judgment, (ii) Turnover, (iii) Avoidance and Recovery of Fraudulent Transfers, (iv) Constructive Trust, (v) Substantive Consolidation, (vi) Breach of Fiduciary Duty, (vii) Unjust Enrichment and (viii) Breach of Contract (the "Complaint") and in support thereof, states as follows:

**JURSIDICTION AND VENUE**

1. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157 and 1334. The causes of action asserted herein are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B), (C), (E), (H) and (O). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

2. Plaintiff AirOcare is a corporation organized under the laws of the State of Delaware. On May 29, 2010 (the "Petition Date"), AirOcare filed a voluntary petition under chapter 11 of the Bankruptcy Code commencing the captioned chapter 11 case (the "Chapter 11 Case"). AirOcare is currently the debtor-in-possession in the Chapter 11 Case and operates its business and manages its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of

the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in the Chapter 11 Case.

3. Defendant Robert D. McDonald ("McDonald") was President and CEO of AirOcare until August, 2009. McDonald is a resident of the Commonwealth of Virginia whose last known address is 201 N. Union Street, Ste. 100, Alexandria, Virginia 22314, as reflected in the proofs of claim McDonald filed in the Chapter 11 Case.

4. Defendant William R. Chambers ("Chambers") was Vice-President and General Counsel of AirOcare until August, 2009. Chambers is a resident of the Commonwealth of Virginia whose last known address is 10229 Cedar Pond Drive, Vienna, Virginia 22182, as reflected in the proofs of claim filed by Chambers in the Chapter 11 Case.

5. Defendant Jack W. Prouty ("Prouty") was a Vice-President of AirOcare until February, 2009. Prouty is a resident of the State of Maryland whose last known address is 309 Dawnwood Drive, Edgewater, Maryland 31037.

6. Defendant Stuart N. Rutchik ("Rutchik") was Vice-President of Finance of AirOcare until February, 2009. Rutchik is a resident of the State of Maryland whose last known address is 723 Galestone Street, Gaithersburg, Maryland 20878, as reflected in the proof of claim Rutchik filed in the Chapter 11 Case.

7. Defendant Terrance O. Woodbridge ("Woodbridge") was Vice-President of Technical Services of AirOcare until November, 2009. Woodbridge is a resident of the State of North Carolina whose last known address is 107 Parkcanyon Lane, Cary, North Carolina 27519.

8. Defendant Ronald B. Mazie ("Mazie") was designated as the trustee of the AirOcare Irrevocable Benefits Trust (the "Trust") on or about May 1, 2008. Mazie is named as a

defendant in this adversary proceeding solely in his capacity as trustee of the Trust.  Mazie is a resident of the State of Maryland whose last known address is 17216 Blossom View Drive, Olney, Maryland  20832, as reflected in the proof of claim Mazie filed in the Chapter 11 Case.

## BACKGROUND

9. AirOcare was originally organized as a limited liability company for the purpose of purchasing and developing technologies for air purification.  In the fall of 2004, AirOcare took steps to convert from a limited liability company to a corporation.  Specifically, on September 28, 2004, AirOcare filed a certificate of incorporation with the Delaware Secretary of State, resulting in its conversion to a Delaware corporation.

10. A few days later on October 1, 2004, Defendant McDonald (described as AirOcare's incorporator) executed an "organizational consent of incorporator," naming Defendants McDonald, Chambers and Prouty as the initial directors of AirOcare.  On the same day, the newly-named directors designated Defendants McDonald, Chambers, Prouty, Rutchik and Woodbridge (the "Former Insiders") as the officers of AirOcare by means of unanimous consent.

11. To further develop the business of AirOcare, on November 1, 2005 the board of directors of AirOcare authorized the purchase of an air purification process patent (the "Patent") from a Chilean businessman named Carlos Lima and/or certain companies controlled by Lima (collectively, "Lima").  Lima's technology purifies air by killing airborne microbes.  The specific purpose of the purchase was to adapt Lima's technology for markets in the United States.

12. Like many start-up businesses, AirOcare suffered cash flow problems.  To generate needed revenue, on or about August 16, 2007 AirOcare's board of directors authorized

entry into a 10-year license agreement (the "Hussman License") with the Hussman Corporation ("Hussman"), a subsidiary of Ingersoll Rand. Under the Hussman License, Hussman obtained, among other things, the right to use AirOcare's technology in the "cold chain supply" business which encompasses low temperature food handling and processing.

13. After execution of the Hussman License, Hussman paid AirOcare $5 million as an initial royalty (the "Initial Royalty"). Additional royalties were to be paid based upon sales performance, subject to minimum quarterly payments and with a cap of $30 million as the maximum royalty that could be paid over the 10-year term of the Hussman License. Pursuant to the terms of the Hussman License, at the end of the license term, the technology will be the property of Hussman, but AirOcare retains the right to license its technology for uses other than in cold chain supply applications.

14. Following the execution of the Hussman License, some or all of the Former Insiders began to systematically divert assets of AirOcare for their own personal benefit. Even though AirOcare's financial resources were still scarce, the Former Insiders used AirOcare as a personal cash-box. Specifically, upon information and belief, the Former Insiders (i) paid themselves excessive compensation, (ii) used AirOcare monies to pay for or reimburse their own personal expenses, and (iii) as described in greater detail below, attempted to establish the Trust for the purpose of providing themselves with lavish insurance benefits and personal loans of $100,000 each. These transfers left AirOcare with an unreasonable small capital for its business and unable to pay its debts as they came due.

15. Due to the diversion of scarce resources for the personal benefit of the Former Insiders, AirOcare remained chronically short of cash despite the increased revenue from the Hussman License. To obtain additional operating cash, AirOcare borrowed $200,000 from

BB&T Bank ("BB&T") in the Fall of 2008. Four of the five Former Insiders personally guaranteed the BB&T loan.

16. AirOcare was unable to repay the BB&T loan when it came due in March of 2009. Shortly before AirOcare defaulted on the BB&T loan, Defendants Prouty and Rutchik were terminated from AirOcare's employment due to lack of funds to pay their salaries. Prouty and Rutchik, concerned about the status of AirOcare and their own personal liability for AirOcare obligations, including unpaid federal withholding taxes, began to share their concerns about corporate finances and operational difficulties with other AirOcare shareholders.

17. As a result, a special meeting of AirOcare's shareholders was held on August 18, 2009, at which time details of AirOcare's financial performance were provided to the shareholders. At the special meeting, shareholders voted to remove Defendants McDonald and Chambers as directors of the company and elected a new board of directors. On August 25, 2009, Chambers and McDonald were removed as officers of AirOcare. On September 30, 2009, another shareholders meeting was held at which time the removal of McDonald and Chambers as directors was re-affirmed. By November of 2009, the remaining Former Insider, Woodbridge, had been removed from his position as an officer of AirOcare.

18. During 2006, certain of the Defendants undertook to create a trust to provide benefits to the Former Insiders. Upon information and belief, the purpose of the proposed trust was to provide life and health insurance benefits to the Former Insiders and their family members. The Former Insiders intended the insurance policies to continue to provide the benefits following a sale of AirOcare's business, if such a sale could be arranged.

19. On December 1, 2006, Bill Snyder, in the alleged capacity of "Business Office Manager" of AirOcare, executed a document referred to as the "AirOcare Irrevocable

Trust Agreement" (the "Trust Agreement") which purported to create the Trust as an irrevocable trust under Maryland law for the benefit of "key named associates of AirOcare and their dependent spouses and children." A copy of the Trust Agreement is attached hereto as Exhibit A.

20. The corporate legislation which allegedly authorized Snyder's execution of the Trust Agreement was a "Unanimous Written Consent of the Board of Directors" dated December 1, 2006 (the "December 2006 Consent"). The December 2006 Consent was, however, not unanimous because not all members of the board of directors signed it.

21. On December 1, 2006, AirOcare's Board of Directors consisted of four persons – Defendants McDonald, Prouty and Chambers and a fourth individual named William Peel, III ("Peel"). Peel was named as a director of AirOcare pursuant to a unanimous consent of the board of directors dated March 31, 2006. Although at some point Peel resigned, he appears to have acted as a member of the board of directors at least through January of 2007.

22. Only three of the directors – Defendants McDonald, Prouty and Chambers, all of whom were intended to be direct beneficiaries of the Trust – executed the December 2006 Consent. Peel, the only disinterested director, did not sign the document, nor did the December 2006 Consent include a signature line for Peel, despite his status at the time as a member of the board of directors. A copy of the December 2006 Consent is attached hereto as Exhibit B.

23. The Trust Agreement states that AirOcare transferred certain property identified on an "Exhibit A" to the Trust for the benefit of the beneficiaries. See Trust Agreement, ¶ 1. Upon information and belief, there has never been an Exhibit A to the Trust Agreement or any other document describing the property transferred by AirOcare to the Trust.

24. The Trust Agreement states that it was created for the benefit of "key named associates of AirOcare and their dependant spouses and children." However, the Trust Agreement fails to identify any specific individuals as the "key named associates" for whose benefit the Trust was purportedly intended. Instead, it states that it exists for "the primary benefit of the lifetime health care provisions, survivor disability and death benefits." See Trust Agreement, ¶ 2.

25. Under the terms of the Trust Agreement, the initial trustee was Geneale L. Burke ("Burke"). Although Burke is identified as the "Trustee" in the preamble of the Trust Agreement and no other trustees are identified, the substantive provisions of the Trust Agreement repeatedly refer to the "Trustees" or the "five (5) Trustees" of the Trust. See, e.g., Trust Agreement, ¶¶ 1, 2, 3, 4 and 9.

26. Subsequent to the execution of the Trust Agreement, one or more of the Defendants executed a document entitled "AirOcare Irrevocable Trust Agreement Amended Trustee September 25, 2007" (the "September 2007 Amendment"). The terms of the September 2007 Amendment appear to be identical to those of the Trust Agreement except that Brian Ackerman ("Ackerman") is named as the substitute trustee, apparently replacing Burke in that capacity. The individual signing the September 2007 Amendment on behalf of AirOcare was Defendant Rutchik, as "VP Finance and Administration."

27. On or about May 1, 2008, Defendant Rutchik executed a document titled "AirOcare Irrevocable Trust Agreement Amended Trustee May 1, 2008" (the "May 2008 Amendment"). The May 2008 Amendment appears to be identical to the Trust Agreement and the September 2007 Amendment except that Defendant Mazie is identified as the successor trustee, replacing Ackerman in that role.

28. Upon information and belief, no validly adopted corporate resolutions or other corporate legislation authorized AirOcare's entry into the Trust Agreement, the October 2007 Amendment or the May 2008 Amendment or authorized any person to execute the Trust Agreement or the alleged amendments on behalf of AirOcare.

29. Upon information and belief, the Former Insiders had AirOcare transfer more than $800,000 to a bank account (the "Trust Account") held at Sandy Spring Bank in the name of the "AirOcare Irrevocable Trust." The largest single transfer into the Trust Account, in the amount of $775,000, was a wire transfer made by AirOcare on September 7, 2007. The $775,000 was derived from the $5,000,000 Initial Royalty which Hussman paid to AirOcare under the Hussman License.

30. Upon information and belief, the purported formation of the Trust was not fully disclosed to, or approved by, the shareholders of AirOcare or Peel, nor were the transfers by AirOcare to the Trust Account fully disclosed to or approved by the shareholders of AirOcare or Peel.

31. The $775,000 wire transfer was made by AirOcare for the personal benefit of the Former Insiders to the detriment of AirOcare and its shareholders and in breach of the Former Insiders' fiduciary duties. A portion of the $775,000 was used to purchase life insurance policies (collectively, the "Insurance Policies") and to fund insurance premiums for the benefit of the Former Insiders and their family members. In addition to these transfers, the former Insiders obligated AirOcare to fund an additional $789,000 in future benefits that inured solely to them personally.

32. Each of the Former Insiders also received a loan in the amount of $100,000 (collectively, the "$100,000 Advances") by means of checks dated September 10,

2007. Copies of the checks evidencing the $100,000 Advances are attached hereto as Exhibits C through G. Defendants Rutchik and Prouty executed corresponding promissory notes (collectively, the "Promissory Notes") in favor of the "AirOcare Irrevocable Trust." The Promissory Notes are in the principal amount of $100,000, (ii) state that they are due on September 10, 2012, and (iii) bear interest at the rate of 3.75%. Upon information and belief, the Promissory Notes were executed well after the $100,000 Advances were funded to Rutchik and Prouty, but were back-dated to reflect September 20, 2007 as the date of the Promissory Notes. Copies of the Promissory Notes are attached hereto as Exhibits H and I respectively.

33. Upon information and belief, no promissory notes reflecting the $100,000 Advances were made by Chambers, McDonald or Woodbridge. Upon information and belief, none of the $100,000 Advances has been repaid by the Former Insiders, in whole or in part.

34. Upon information and belief, on September 7, 2007, Defendants Chambers and McDonald (and perhaps other Former Insiders) caused an amendment to the Hussman License to be executed (the "License Amendment"). Under the License Amendment, the fields of use licensed by AirOcare to Hussman were broadened, to the detriment of AirOcare, in exchange for Hussman's advance payment of the minimum royalty.

35. Upon information and belief, under the License Amendment AirOcare also assigned its obligations under Section 5 of the Hussman License to a company called AirOcare/HSM Technical Support Corporation ("TSC"). Upon information and belief, some or all of the Former Insiders created and/or owned TSC.

36. Shortly after the execution of the License Amendment, Defendants Prouty and McDonald also entered into consulting agreements with Hussman dated September 15, 2007 (collectively, the "Consulting Agreements"). Upon information and belief, under the Consulting

Agreements Defendants Prouty and McDonald agreed to perform the following services for Hussman: (i) develop business strategies relative to the launch of the AirOcare business with Hussman; (ii) work with Ingersoll Rand executives to develop sales and marketing plans for various industry segments; (iii) make sales calls with Ingersoll Rand; (iv) develop relationships with subject matter experts; (v) represent Ingersoll Rand in various forums to market the AirOcare technology, including trade shows, media publications, association meetings and seminars; (vi) assist in building air quality and food safety expertise with Ingersoll Rand; (vii) act as interim management in "areas jointly agreed upon" with Ingersoll Rand management; and (viii) build and expand capabilities with Ingersoll Rand such as food safety consulting, testing and validation.

37. Upon information and belief, in exchange for these services the Consulting Agreements provided for the payment to Defendants Prouty and McDonald of weekly "retainer" payments of $6,000 each. All hours over twenty hours per week were to be paid at the rate of an additional $300/hour. Prouty and McDonald were also eligible for certain incentive bonuses. The retainer payments were to be billed through a company controlled by Prouty called "Step Change Management, LLC." The initial term of the Consulting Agreements was twelve months, with an automatic renewal provision.

38. Upon information and belief, each of these services to be provided by Defendants McDonald and Prouty under the Consulting Agreements could have been provided to Hussman by AirOcare, with the compensation for such services being paid to AirOcare rather than to Defendants McDonald and Prouty. Upon information and belief, at no time did Defendants McDonald or Prouty offer AirOcare the opportunity to provide the services called for under the Consulting Agreements.

39. Upon information and belief, in June of 2009 Defendants Chambers and McDonald incorporated a Virginia limited liability company named Food Safety Validation, LLC ("FSV") whose business was food safety and purity consulting. A copy of FSV's registration papers filed with the Virginia State Corporation Commission is attached hereto as Exhibit J. Upon information and belief, FSV was utilized by Defendants Chambers and McDonald to compete with AirOcare and to attract business opportunities that would have been available to AirOcare.

40. Upon information and belief, one or more of the Defendants authorized the payment of at least $97,858.46 by AirOcare to Defendant Chambers for personal expenses or as an unsecured loan, which payment has never been repaid by Defendant Chambers to AirOcare, in whole or in part.

41. Upon information and belief, one or more of the Defendants authorized the payment of at least $26,019.44 by AirOcare to Defendant Woodbridge for personal expenses or as an unsecured loan, which payment has never been repaid by Defendant Woodbridge to AirOcare, in whole or in part.

42. Upon information and belief, one or more of the Defendants authorized the payment of at least $58,200.00 by AirOcare to Defendant McDonald for undocumented personal expenses and/or as an unsecured loan, which payment has never been repaid by Defendant McDonald to AirOcare, in whole or in part (such advances to McDonald, Woodbridge and Chambers being referred to collectively as the "Reimbursement Advances" and together with the $100,000 Advances, the "Insider Advances").

43. Upon information and belief, the transfers of property from AirOcare to the Former Insiders described above, including the payments for the Insurance Policies, the

Insider Advances and the payment of excessive compensation (whether or not directly or through the Trust as a mere conduit or intermediate transferee) rendered AirOcare incapable of paying its existing debts as they became due, left AirOcare with unreasonable small capital for its business, were made without fair consideration and when AirOcare believed that it would incur debts beyond its ability to pay as they matured, and/or were made with actual intent to hinder, delay or defraud present or future creditors.

## COUNT ONE

## DECLARATORY JUDGMENT

44. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 43 above as if fully re-alleged herein.

45. Pursuant to 28 U.S.C. §§ 2201-02 and § 541 of the Bankruptcy Code, AirOcare seeks a declaration that:

(a) The Trust has never been, and was never, created as a valid and enforceable trust under applicable law;

(b) The Trust Agreement was not executed by an authorized agent of AirOcare and is therefore not a binding contract or obligation of AirOcare;

(c) The Trust cannot be enforced due to the Trust Agreement's vagueness as to its beneficiaries and property and is therefore void;

(d) Any and all purported transfers of property by AirOcare to the Trust are void;

(e) The Promissory Notes, as unauthorized transactions of a void entity, are themselves void and AirOcare shall have the right to immediately recover all of the $100,000 Advances;

(f) Any property which was purchased or funded with property of AirOcare through any accounts held in the name of the Trust, including (i) the Insurance Policies, (ii) the Promissory Notes, and (iii) the $100,000 Advances, and all rights with respect thereto, shall be declared to be the property of the bankruptcy estate of AirOcare and no further endorsement or assignment shall be needed for AirOcare to exercise all rights of ownership of any such property; and

(g) AirOcare has no obligation to fund, and is not bound by any obligations of, the Trust, the Trust Agreement or the Insurance Policies.

## COUNT TWO

## TURNOVER

46. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 45 above as if fully re-alleged herein.

47. Pursuant to §§ 542 and/or 543 of the Bankruptcy Code, AirOcare seeks entry of a judgment compelling the immediate turnover to AirOcare of all property which may be nominally held in the name of the Trust, including without limitation, (i) the Insurance Policies, (ii) the right to recover the $100,000 Advances, and (iii) the Promissory Notes.

## COUNT THREE

## FRAUDULENT CONVEYANCE

48. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 47 above as if fully re-alleged herein.

49. AirOcare seeks entry of a judgment pursuant to §§ 544, 548 and 550 of the Bankruptcy Code avoiding all transfers of property (including excessive compensation) by AirOcare to or for the benefit of the Former Insiders, including those made directly or through

the Trust, either as a mere conduit or an intermediate transferee, and entering judgment in its favor against the Former Insiders in the amount of such transferred property.

## COUNT FOUR

## CONSTRUCTIVE TRUST

50. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 49 above as if fully re-alleged herein.

51. The purported transfer of property of AirOcare to the Trust was not authorized by corporate legislation of AirOcare, was for the exclusive benefit of the Former Insiders and not for the benefit of AirOcare, and was therefore wrongful.

52. Accordingly, AirOcare seeks entry of a judgment imposing a constructive trust for its benefit upon all property of the Trust, including without limitation, (i) the Insurance Policies, (ii) the right to recover the $100,000 Advances, and (iii) the Promissory Notes.

## COUNT FIVE

## SUBSTANTIVE CONSOLIDATION

53. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 52 above as if fully re-alleged herein.

54. A substantial identity exists among the assets, liabilities and financial affairs of the purported Trust and AirOcare. Unless the purported assets of, and claims against, the Trust are combined with the assets and claims of AirOcare, substantial prejudice will inure to AirOcare and its creditors and shareholders.

55. Accordingly, AirOcare seeks entry of a judgment substantively consolidating into and with AirOcare's bankruptcy estate the purported assets of the Trust,

including without limitation, the (i) Insurance Policies, (ii) the right to recover the $100,000 Advances, and (iii) the Promissory Notes.

## COUNT SIX

## BREACH OF FIDUCIARY DUTY

56. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 55 above as if fully re-alleged herein.

57. The Former Insiders, as directors and/or officers of AirOcare, owed AirOcare fiduciary duties of care, loyalty and good faith. Upon information and belief, the Former Insiders breached these duties of care, loyalty and good faith by engaging in the following transactions: (i) payment of unreasonable and excessive compensation; (ii) payment of the Reimbursement Advances; (iii) transfers to the Former Insiders and/or to the purported Trust, including without limitation, payment of premiums on the Insurance Policies and/or the $100,000 Advances; (iv) entry into the Consulting Agreements; (v) causing AirOcare to enter the License Amendment; and/or (vi) the creation of FSV and/or TSC. In so doing, the Former Insiders consistently and repeatedly misappropriated corporate opportunities that were within the scope of AirOcare's business, converted assets of AirOcare for their personal benefit to the detriment of AirOcare, and otherwise violated their fiduciary duties and for which the Former Insiders are jointly and severally liable.

58. AirOcare therefore seeks entry of judgment against the Former Insiders, jointly and severally, for damages directly and proximately caused by the Defendants' breaches of their fiduciary duties to AirOcare in an amount to be proved at trial.

## COUNT SEVEN

## UNJUST ENRICHMENT

59. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 58 above as if fully re-alleged herein.

60. As a result of the payments made by AirOcare (i) to fund the Trust, (ii) to pay the premiums on the Insurance Policies, (iii) to pay the Insider Advances (whether or not directly or through the Trust as a mere conduit), and (iv) to pay excessive compensation to the Former Insiders, the Former Insiders have received unjust enrichment.

61. Accordingly, AirOcare seeks entry of judgment against each of the Former Insiders in an amount to be proved at trial.

## COUNT EIGHT

## BREACH OF CONTRACT

62. AirOcare hereby incorporates the allegations contained in paragraphs 1 through 61 above as if fully re-alleged herein.

63. Upon information and belief, at the time the Insider Advances were made, the Former Insiders receiving, directly or indirectly, the Insider Advances agreed to repay in full the amount of the Insider Advances.

64. The Former Insiders have failed and refused to repay the Insider Advances.

65. AirOcare therefore seeks entry of judgment against each of the Former Insiders for damages directly and proximately caused by their breaches of their agreement to repay the advances in an amount to be proved at trial.

**CONCLUSION**

WHEREFORE, AirOcare, Inc., Debtor and Debtor-in-Possession, respectfully requests entry of judgment upon the counts enumerated above and also seeks entry of judgment for (i) its reasonable attorneys fees, and (ii) all pre- and post-judgment interest allowable under applicable law. AirOcare also seeks such other and further relief as is just and equitable.

Dated: November 12, 2010

/s/Lawrence A. Katz
Lawrence A. Katz  (VSB No. 47664)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone:  (703) 760-1600
Facsimile:  (703) 821-8949
lakatz@venable.com

*Counsel to AirOcare, Inc.,
Debtor and Debtor-in-Possession*